IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

               Plaintiff(s),

     v.

BAHATI BANKS,

               Defendant(s).

No. 3:24-cr-00422-HZ

OPINION & ORDER

William M. Narus
Nicole M. Hermann
000 S.W. Third Avenue, Suite 600
Portland, OR 97204

       Attorneys for Plaintiff

Amy L. Bingham
187 High Street N.E., Suite 209
Salem, OR 97301

       Attorney for Defendant

HERNÁNDEZ, Senior District Judge:

This matter comes before the Court on Defendant Bahati Banks' Motion to Suppress Evidence, ECF 23. For the following reasons, Defendant's Motion is denied.

## BACKGROUND

On April 27, 2024, an individual driving a Dodge Charger attempted to elude police and crashed into another vehicle near the intersection of S.E. 112th Avenue and S.E. Powell Boulevard in Portland, Oregon causing significant damage to both the Charger and the other vehicle. The driver of the Charger exited the vehicle and ran from the scene. When Portland Police Bureau ("PPB") officers responded to the crash, they were advised that the driver of the Charger was a heavy set, black man, possibly wearing a black shirt. An officer performed a welfare check on the Charger to make sure there were no injured occupants inside the vehicle. Due to the significant tint to the windows of the Charger, the officer had to open the driver's side door to perform the check. Upon opening the door, the officer observed a rifle next to the center console near the driver's seat. The officer did not search the vehicle at that time, instead the vehicle was secured while officers applied for and obtained a search warrant. The subsequent search recovered a Bushmaster Carbine 15 .223 caliber rifle, a magazine for that rifle, and 29 rounds of .223 ammunition.

Officers traced the route of the driver of the Charger as he ran from the scene and located witnesses who observed the driver flee and jump a fence. Near the fence, officers located Department of Motor Vehicles ("DMV") paperwork that listed Defendant's name. An officer called the mobile telephone number listed on the recovered DMV paperwork (xxx-xxx-1933) and spoke with Defendant, who acknowledged that he was the person named in the DMV

paperwork and that he was the registered owner of the Charger. Defendant stated, however, that he was not driving the car at the time of the accident and that he was in Vancouver, Washington.

Officers obtained video footage from a residence near the accident site that showed an adult, black male, who matched the description provided to officers at the scene, running past the house. Defendant's DMV photograph also looked like the individual in the video footage. Officers contacted Defendant's state supervision officer[1] and showed him the video footage. The supervision officer stated he believed the individual in the video was Defendant. The supervision officer also noted that telephone number x1933 was the same number that he had on file for Defendant.

In May 2024, FBI Special Agent Amanda Mullinix served two administrative subpoenas to T-Mobile requesting telephone and toll records for telephone number x1933. The results showed that Defendant's girlfriend, Michelle Perez Barrera ("Perez"), was the subscriber for x1933 and one other mobile phone number; that numerous communications to Perez had been made from x1933; and that x1933 was still in active use at the time of the accident. On June 3, 2024, Mullinix obtained a geolocation warrant for location data for x1933 noting that the historical location data would, among other things, "assist in corroboration of [Defendant's] location at the time of the elude and vehicle collision, in which the firearm was seized." Mullinix testified at the evidentiary hearing that the geolocation data gleaned from the June 3, 2024 warrant reflected that x1933 was in the vicinity of the vehicle crash when the crash happened and then it "ended up in the vicinity of" 13721 S.E. Steele Street, Portland Oregon 97236 ("the

---

[1] Defendant was on state post-prison supervision and had an active warrant for violation of his supervision at the time of the collision.

residence"). Defendant's supervision officer separately identified the residence as the home of Jaquan Harris[2] and a place where Defendant might be living.

Between May 24, 2024, and June 17, 2024, Mullinix surveilled the residence. On May 24, 2024, Mullinix observed a "black male consistent in appearance to" Defendant walk from the back side of the residence to the front and remain in the front yard talking on a mobile telephone. Def. Mot. to Suppress, ECF 23, Ex. A, ¶ 30. When Mullinix checked the records for x1933 "around the time of" this surveillance, the "cell site information for [x1933] indicated the usage of a cell tower in the near vicinity of" the residence. *Id.* ¶ 32. Mullinix, therefore, believed the individual was Defendant. During the surveillance period the geolocation data showed that x1933 spent "large portions of the days and nights in the vicinity of [the residence] consistent with someone who lives there." *Id.* ¶ 36. Mullinix also observed Perez visiting the residence and walking to and from the direction of the back side of the residence.

Mullinix's investigation revealed that although the residence has only one electric meter and one mailbox, rental websites advertised the residence as two units that can be rented separately: Unit A and Unit B. Unit B is located in the back upstairs section of the residence and has an entrance in the back of the residence. The remainder of the residence is Unit A, a laundry room, and a garage. During the surveillance period Mullinix observed an unknown male, who she believed to be someone other than Defendant, walk from the back of the residence around to the front porch to pick up a food delivery then walk back around to the back of the residence. Based on her observations of Perez and Defendant, Mullinex believed Unit B was being sublet to Defendant and possibly others.

---

[2] A May 3, 2024 query to the DMV reflected that Harris had a valid driver's license issued March 28, 2024, which listed his address as the residence.

On June 18, 2024, Mullinix applied for a warrant to search "the premises located at 13721 SE Steele Street Portland Oregon 97236"; "the cellular telephone with assigned number [x1933]"; "any other cellular telephones in the area control or custody of" Defendant; and "the person of" Defendant. Def.'s Mot., Ex. A, ¶ 2(a)-(d). In her supporting affidavit Mullinix noted the events of the crash; stated that the telephone and toll records indicated that Defendant spent substantial time at the residence; noted that Perez frequently visited the residence; and discussed the May 24, 2024 sighting of the individual at the residence that telephone records indicated was Defendant. Mullinix stated she has "participated in multiple . . . firearm investigations as a primary and supporting investigative agent," is "familiar with the methods of operation used by . . . persons prohibited from possessing a firearm" including "their methods of distribution storage and transportation of firearms" and "methods to avoid detection by law enforcement including the use of cellular telephone technology, text messages, counter surveillance, false or fictitious identities, and coded communications." Def. Mot., Ex. A, ¶ 5. Mullinix also stated that based on her "training and experience," she "know[s] that firearms and firearm accessories are valuable commodities that are kept for long periods of time"; that "it is common practice among persons who illegally possess firearms to secrete the firearms upon their person, upon the persons of co-conspirators, within vehicles they are using, [and] within their residence or residence of third-party individuals that do not maintain a criminal history"; that "felons . . . in possession of a firearm will often conceal that firearm in these locations for long periods of time because they cannot legally purchase own or possess them making it difficult to readily acquire them." *Id.* ¶ 6. Based on the information obtained from Defendant's supervision officer, the telephone subpoenas, and the "surveillance observations compared with geolocation data," Mullinix stated that she believed Defendant resided at the residence and used the x1933 mobile

phone. Mullinix also stated that based on the seizure of the firearm from Defendant's vehicle, "it is reasonable to believe there are other firearms, ammunition, and/or firearm accessories present at the Target Residence." *Id*. ¶ 45. As a result, Mullinix asserted there was probable cause for a warrant to search for, among other things: "Weapons to include rifles, shotguns, and handguns, as well as ammunition, shell casings, bullets, magazines, cleaning equipment, holsters, gun boxes and cases, trigger locks, gun safes, gun parts and tools, targets, receipts, and bills of sale" as well as "[c]ellular telephones . . . capable of storing data that constitutes evidence of possession of a firearm." *Id.* Attachment B, ¶ 1(a), (e). Items to be searched for, seized, and examined on x1933 included, among other things, "[e]vidence indicating how and when [x1933] was accessed or used to determine the chronological and geographic context of account access use and events relating to the crime under investigation and to the . . . owner" of x1933. *Id.*, Attachment B-2, ¶ 1(b).

Mullinix explained that the residence was divided into Unit A and Unit B and noted that she located several addresses for Harris including one for the residence and another from December 2023 through January 2024 listing the residence and specifying "Apt. A." *Id*. ¶ 39. Based on her surveillance and this information, Mullinix stated that she believed Harris was the owner or primary renter of the residence and that he sublet Unit B to Defendant. Mullinix also noted that, based on her review of interior photographs from the residence obtained from rental websites, "there is at least one area, possibly two areas inside the residence, that connect Unit A and Unit B." *Id.* ¶ 42. Mullinix stated that "[i]nvestigators [were] unable to definitively determine . . . if the occupants of Unit A and Unit B are associated with each other [or] if the occupants of Unit A and Unit B transition between units or ever have access to the unit in which they do not primarily reside." *Id.* "Based on the complexities" of the residence and "officer

safety considerations regarding occupant access within the residence," Mullinix asked the Court to

> authorize law enforcement to enter clear and secure the entire Target Residence prior to beginning the search Once the Target Residence is secure investigators will limit the search to Unit B believed to be the unit in which [Defendant] is residing based on surveillance observations detailed above. Once inside the residence if investigators obtain information supporting [Defendant] having access to Unit A through either plain view observations or occupant statements investigators will pursue an additional search warrant for Unit A.

*Id.* ¶ 44. On June 18, 2024, United States Magistrate Judge Jeffrey Armistead signed the warrant and approved the search.

On June 21, 2024, at 6:00 a.m. the FBI Special Weapons and Tactics ("SWAT") team executed the search warrant on the residence. The SWAT team went into Unit B and also loud hailed the residence to announce the presence of law enforcement and their purpose. Minutes later Defendant and Harris exited Unit A through the front door of the residence and advised that they both lived in Unit A and that an unknown male resided in Unit B. The SWAT team cleared the entire residence; conducted a visual inspection of Unit B, which was unoccupied; observed mail in Unit B consistent with Defendant's statement that he did not live in Unit B; and determined there were no other individuals in the residence. Defendant was arrested for his outstanding state warrant, taken into custody at the scene on that warrant, and placed in the back of a patrol car. The SWAT team then handed off the site to the search team, which included a walk through of the residence to point out anything that could be a threat and notification of any damage created or caused during the search. During the walk through, the SWAT team identified two firearms present in plain view, but nothing was seized during the clearance of the residence or the hand off, and no mobile phones were recovered at that time.

When Mullinix was made aware that Defendant lived in Unit A, she drafted an amended application to search Unit A. While Mullinix was waiting for the Court to review the amended application, Defendant asked to use the bathroom. Mullinix advised Defendant that law enforcement could not let anyone use the bathroom in Unit A without searching it first due to officer safety concerns. Defendant and Harris refused to consent to search of the bathroom. An FBI agent searched the downstairs bathroom in Unit A for weapons, found a firearm in the cabinet under the sink, discontinued the search, and left the bathroom. Defendant was not permitted to use the bathroom in Unit A, the amended application to search Unit A did not include any information about that firearm, and the firearm was not seized until after law enforcement obtained the warrant to search Unit A.

At 8:48 a.m. United States Magistrate Judge Youlee Yim You signed a warrant to search Unit A. Mullinix's affidavit in support of the June 21, 2024 warrant was substantially the same as that in support of the June 18, 2024 warrant except that Mullinix added three paragraphs:

> On June 18, 2024, United States Magistrate Judge Jeffrey Armistead approved search warrants to search [Defendant's] residence, cell phone, person and DNA. The residence is a townhome split into a Unit A and Unit B and agents incorrectly believed [Defendant] resided in Unit B. On June 21, 2024, FBI agents executed the search warrant and [Defendant] came out of Unit A and admitted to living in Unit A. We now seek authority to search Unit A.

> * * *

> On June 21, 2024, the FBI [SWAT] Team executed the premise warrant at the Target Residence. [Defendant] and Harris both exited from Unit A. Both [Defendant] and Harris told investigators they live in Unit A and do not know the individual residing in Unit B. Agents incorrectly believed that [Defendant] and Harris resided in different units.

> Based on the above information, I request the court to authorize the search of Unit A of the Target Residence. Investigators will limit the search to Unit A where [Defendant] resides

Gov't Ex. 1, ECF 26, ¶¶ 9, 46, 47. Items "to be searched for, seized, and examined" continued to

include "[w]eapons to include rifles, shotguns, and handguns, as well as ammunition, shell

casings, bullets, magazines, cleaning equipment, holsters, gun boxes and cases, trigger locks, gun

safes, gun parts and tools, targets, receipts, and bills of sale" as well as "[c]ellular telephones . . .

capable of storing data that constitutes evidence of possession of a firearm." *Id.* Attachment B-1,

¶ 1(a), (e).

      When agents executed the warrant, they located two Glock handguns, an AM-15 rifle,

multiple magazines and a variety of ammunition, suspected cocaine, and mobile phone x1933. A

later warranted search of x1933 revealed evidence showing Defendant's possession of firearms

including photographs of Defendant with several of the firearms located during the search of the

residence.

      On November 13, 2024, Defendant was indicted on two counts of felon in possession in

violation of 18 U.S.C. § 922(g)(1) based on the firearm found in the Charger and the firearms

found in Unit A and one count of unlawful possession of a machinegun in violation of 18 U.S.C.

§ 922(o) and 924(a)(2) based on a machinegun conversion device found in Unit A.

      On June 27, 2025, Defendant moved to suppress "any tangible evidence seized from

[Defendant's] . . . residence, cell phone devices and other items seized because of the

execution of the warrants." Def. Mot. at 1. The Court held an evidentiary hearing on August 14,

2025, and took the matter under advisement.

## STANDARDS

      "To be valid, a search warrant must be supported by an affidavit establishing probable

cause." *Cameron v. Craig*, 713 F.3d 1012, 1018 (9th Cir. 2013) (internal quotation marks

omitted). "Probable cause exists where, under the totality of the circumstances, a reasonable

officer has occasion to believe that the search will uncover evidence relating to a suspected crime." *Id.*; *see also United States v. Fries*, 781 F.3d 1137, 1150 (9th Cir. 2015) ("Probable cause for a search requires a fair probability that contraband or evidence of a crime will be found in a particular place, based on the totality of the circumstances.") (internal quotation marks omitted). The probable cause standard requires only a "fair probability" that contraband or evidence is located in a particular place. *United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) (citing *Illinois v. Gates*, 462 U.S. 213, 246 (1983); *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006)). "Whether there is a fair probability depends upon the totality of the circumstances, including reasonable inferences, and is a commonsense, practical question." *Id.* (internal quotation marks omitted). "Neither certainty nor a preponderance of the evidence is required." *Id.* A reviewing court may not "flyspeck the affidavit through de novo review," and must give "great deference" to the issuing judge's decision. *Gourde*, 440 F.3d at 1060; *see also United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007) ("A magistrate judge's finding of probable cause is entitled to great deference."). The "'resolution of doubtful or marginal cases' . . . 'should largely be determined by the preference accorded to warrants.'" *Kelley*, 482 F.3d at 1050-51 (quoting *Gates*, 462 U.S. at 237 n.10). The issuing magistrate judge "may rely on the training and experience of affiant police officers." *United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002).

"To be reasonable under the Fourth Amendment, a search warrant must not be overbroad; its breadth must be limited to the scope of the probable cause on which the warrant was based." *Blight v. City of Manteca*, 944 F.3d 1061, 1066 (9th Cir. 2019) (citing *In re Grand Jury Subpoenas*, 926 F.2d 847, 856–57 (9th Cir. 1991)). In addition, "[o]fficer authority to search property listed in a search warrant is not unlimited." *Id.* at 1067 (citing *Mena v. City of Simi*

*Valley*, 226 F.3d 1031, 1038 (9th Cir. 2000)). "If officers know or should know there is a risk

that they are searching a residence that was erroneously included in a search warrant, then they

must stop the search as soon as they are 'put on notice' of that risk." *Id.* (citing *Maryland v.*

*Garrison*, 480 U.S. 79, 86–87 (1987)).

**DISCUSSION**

Defendant moves to suppress evidence and items seized "because of execution of the

warrants" on the grounds that the affidavits and warrants did not contain sufficient probable

cause, and if they did contain probable cause to search the residence, the warrants were

overbroad.

## I.    Search of Unit B

Defendant asserts neither warrant provided sufficient probable cause "for a search of the

premises at 13721 SE Steele Street, Portland, Oregon 97236."

In her affidavit in support of the June 18, 2024 warrant, Mullinix noted the DMV

paperwork left near the fence that contained Defendant's name and the video taken of an

individual running away from the scene of the collision that Defendant's supervision officer

identified as Defendant. The affidavit noted that the DMV paperwork found near the fence listed

phone number x1933, Defendant answered x1933 after the collision, and x1933 was the same

telephone number that the supervision officer had on file for Defendant. In addition, Mullinix

testified that the geolocation data reflected that x1933 was in the vicinity of the vehicle crash

when the crash happened, and then it "ended up in the vicinity of" the residence. The affidavit

noted that on May 24, 2024, Mullinix observed a "black male consistent in appearance to"

Defendant walk from the back side of the residence to the front and remain in the front yard

talking on a mobile telephone. When Mullinix checked the records for x1933 "around the time

of" this surveillance, the "cell site information for [x1933] indicated the usage of a cell tower in the near vicinity of" the residence. In addition, during the surveillance period, the geolocation data showed that x1933 spent "large portions of the days and nights in the vicinity of [the residence] consistent with someone who lives there," and Mullinix observed Perez visiting the residence and walking to and from the direction of the back side of the residence. Further, Mullinix located several addresses for Harris, including one for the residence and another from December 2023 through January 2024 for the residence and specifying "Apt. A." Based on her surveillance and this information, Mullinix noted in her affidavit that she believed Harris was the owner or primary renter of the residence and that he sublet Unit B to Defendant.

The Court finds that this information was sufficient to establish probable cause that Defendant lived in Unit B of the residence for purposes of the June 18, 2024 warrant. In addition, nothing was seized from Unit B; nothing viewed when authorities did a cursory search of the Unit B was used in the application for the June 21, 2024 warrant; and there was no exploitation of the search of Unit B. The Court, therefore, denies Defendant's Motion to Suppress as to the search of Unit B.

## II.    Clear and Secure of Entire Residence

Defendant asserts the June 18, 2024 warrant was too broad when it permitted the authorities to clear and secure the entire residence before searching Unit B.

"Generally, if a structure is divided into more than one occupancy unit, probable cause must exist for each unit to be searched." *Mena v. City of Simi Valley*, 226 F.3d 1031, 1038 (9th Cir. 2000) (citation omitted); *see also Blight v. City of Manteca*, 944 F.3d 1061, 1066 (9th Cir. 2019) (citation omitted) ("When a structure contains two residences or two residences share a lot, there must be probable cause to search each."). The Ninth Circuit has held, however, that "a

warrant is valid when it authorizes the search of a street address with several dwellings if the defendants are in control of the whole premises, if the dwellings are occupied in common, or if the entire property is suspect." *United States v. Alexander*, 761 F.2d 1294, 1301 (9th Cir. 1985).

It is questionable whether the affidavit for the June 18, 2024 warrant established probable cause to secure the entire residence. There was no evidence that Defendant was in control of the entire premises or that units A and B were occupied in common. *See, e.g., Blight,* 944 F.3d at 1066 ("Here, there was a substantial basis for the issuing judge to believe Ford was in control of the whole premises. The informant told the detectives Ford owned the entire property and said Serrano lived in the mobile home for the purpose of helping Ford with his drug operation."). Mullinix noted it was uncertain whether Unit A and Unit B had access to each other or if the residents of the units "transition between units." But that is insufficient to establish that the entire property was suspect. *See, e.g., Blight*, 944 F.3d at 1067 ("There was . . . a substantial basis for the issuing judge to believe the entire property was suspect. The informant told the detectives the marijuana was grown outside and then processed in the buildings on the property.").

But even if the June 18, 2024 warrant did not establish probable cause to secure the entire residence, the Court would not grant Defendant's motion on that basis. Suppression is not warranted when the government shows that no information gained from a Fourth Amendment violation affected (1) law enforcement's decision to seek a warrant or (2) the magistrate's decision to grant it. *United States v. Saelee*, 51 F.4th 327, 335 (9th Cir. 2022) (citing *Murray v. United States*, 487 U.S. 533, 539–40 (1988)). In her initial affidavit, Mullinix indicated that the government would pursue a warrant for Unit A if the initial investigation revealed that Defendant had access to Unit A. No items were seized from the residence before the June 21, 2024 warrant was issued to search Unit A. And nothing viewed when the residence was secured was used in

the application for the June 21, 2024 warrant. Thus, there was no exploitation of the seizure of the residence before the warrant was issued to search Unit A. Accordingly, the Court denies Defendant's Motion to Suppress on the basis that the warrant improperly allowed the government to secure the entire residence.

### III.    Search of the Bathroom

Defendant moves to suppress based on the search of the bathroom. Defendant notes that neither Harris nor Defendant gave authorities permission to search the bathroom, and authorities did not have a warrant to search Unit A at the time they searched the bathroom. The government asserts that a search of the bathroom was necessary for officer safety and that the search was permissible under *Maryland v. Buie*, 494 U.S. 325 (1990).

A "protective sweep" is a limited search incident to a lawful arrest that is conducted to protect the safety of police officers or others. *Buie*, 494 U.S. at 327. A protective sweep is "confined to a cursory visual inspection of those places in which a person might be hiding" who could pose danger to the officers or others. *Id.* But a protective sweep of a home incident to a lawful arrest must be justified by "'a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *United States v. Lemus*, 582 F.3d 958, 963 n.2 (9th Cir. 2009) (quoting *Buie*, 494 U.S. at 337). "For an officer to harbor a reasonable suspicion of danger there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *United States v. Paopao*, 469 F.3d 760, 766 (9th Cir. 2006) (internal quotations and citations omitted). A protective sweep cannot be justified by mere speculation that another person might be inside the home. *See United States v. Delgadillo–Velasquez*, 856 F.2d 1292,

1298 (9th Cir. 1988) (holding a protective sweep unconstitutional when officers had "no information that any other persons were in the apartment"). "Not knowing whether someone who may pose a danger to others is present is not an articulable fact that justifies a protective sweep." *United States v. Henderson*, No. 3:20-CR-00022-HZ, 2022 WL 843338, at *4 (D. Or. Mar. 22, 2022) (citing *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996)). Justification for a protective sweep also "cannot be based on the dangerousness of the arrested individual; it must be based on an articulable suspicion of danger from other persons present in the home." *Henderson*, 2022 WL 843338, at *4 (citing *Colbert*, 76 F.3d at 777) ("If district courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly every arrest taking place in or near a home will include a protective sweep.")).

In this case the officers were not sweeping the premises to look for others. They wanted to be sure no weapons were in the bathroom before they allowed Defendant to use it, and indeed a firearm was located in the bathroom. After locating the firearm, the officers refused to let Defendant use the bathroom and did not seize the firearm or any other evidence. Given that Defendant was under arrest on unrelated charges and was suspected of being a felon in possession of a firearm, the cursory sweep for weapons in the bathroom was reasonable and does not violate the Fourth Amendment. *Buie*, 494 U.S. at 327; *Paopao*, 469 F.3d at 766.

Even if there were not specific and articulable facts which, taken together with the rational inferences from those facts, warranted the officers' belief that the bathroom harbored a danger sufficient to support a protective sweep of that area, nothing was seized from the bathroom and there was no exploitation of the firearm that was found during the protective sweep. *See Saelee*, 51 F.4th at 335. Accordingly, the Court denies Defendant's Motion to Suppress as to the search of the bathroom.

### IV.     Search of Unit A for Mobile Phone x1933

In the June 21, 2024 affidavit Mullinix explained that when agents executed the June 18, 2024 warrant, Defendant and Harris exited from Unit A and told investigators that they lived in Unit A and did not know the individual residing in Unit B. The Court finds that this information, along with the other information in the June 21, 2024 affidavit, was sufficient to establish probable cause that Defendant lived in Unit A.

Mullinix noted that the DMV paperwork found near the fence listed the mobile phone number x1933, Defendant answered x1933 after the collision, and x1933 was the same telephone number that the supervision officer had on file for Defendant. Although Defendant told officers that he was not driving the vehicle at the time of the crash and that he was in Vancouver, Washington, Mullinix testified that the geolocation data reflected that x1933 was in the vicinity of the vehicle crash when the crash happened and then it "ended up in the vicinity of" the residence. The affidavit stated that on May 24, 2024, Mullinix observed a "black male consistent in appearance to" Defendant talking on a mobile phone in the front yard of the residence. When Mullinix checked the records for x1933 "around the time of" this surveillance, the "cell site information for [x1933] indicated the usage of a cell tower in the near vicinity of" the residence. In addition, during the surveillance period, the geolocation data showed that x1933 spent "large portions of the days and nights in the vicinity of [the residence] consistent with someone who lives there." This evidence was sufficient to establish, based on the totality of the circumstances, a fair probability that evidence of the crime of felon in possession of the firearm and ammunition found in the Charger would be found on mobile phone x1933.

In addition, the warrant to search for x1933 was based on evidence wholly separate from anything seen during the protective sweep of the residence. Thus, "[t]he officers' initial . . .

[sweep] does not require suppression of evidence seized while executing a search warrant [for x1933] obtained on the basis of information wholly unconnected to the initial entry." *Henderson,* 2022 WL 843338, at *6 (citing *Segura v. United States*, 468 U.S. 796, 796 (holding that evidence should not be suppressed after officers illegally entered the defendant's apartment because "there was an independent source for the warrant under which that evidence was seized")).

The Court finds that the warrant was supported by probable cause to the extent that it authorized the search of Unit A for mobile phone x1933. The Court, therefore, denies the Motion to Suppress as to the search for x1933.

## V.    Search for Other Firearms or Ammunition

Both warrants authorized authorities to search the residence for "[w]eapons to include rifles, shotguns, and handguns, as well as ammunition, shell casings, bullets, magazines, cleaning equipment, holsters, gun boxes and cases, trigger locks, gun safes, gun parts and tools, targets, receipts, and bills of sale." Gov't Ex. 1, Attachment B-1, ¶ 1(a). Relying on *United States v. Nora,* 765 F.3d 1049, 1060 (9th Cir. 2014), Defendant contends both warrants lacked "probable cause that [Defendant] possessed any other guns or ammunition based on the incident with the car, elude and crash." Def. Mot. at 12.

In *Nora*, 765 F.3d at 1051, police officers saw the defendant standing on his front porch with another man. When the officers attempted to engage the defendant in conversation, he "spun toward the front door" and entered the house. *Id.* As the defendant did so, the officers saw he was holding a "blue-steel semi-automatic handgun." *Id.* A standoff ensued, and eventually the defendant came out without the gun and was searched, which yielded "a small amount of marijuana and more than $1,000 in cash." *Id.* at 1052. When questioned by officers, the defendant admitted that he had personal use quantities of methamphetamine and heroin in a

dresser drawer, that he lived at the house, and that he belonged to a particular street gang. *Id.*
After determining his identity, the officers ran a criminal background check, which revealed that
the defendant had a prior conviction for carrying a loaded firearm and two prior convictions for
being a felon in possession of a firearm. *Id.* The officers obtained a warrant to search the
defendant's home for the following items: "marijuana, methamphetamine, heroin, and related
paraphernalia; evidence relating to the sale of narcotics; firearms, magazines, and ammunition;
and evidence of gang membership." *Id.* The affidavit supporting the warrant relied on "the
officers' observations of [the defendant] outside his home, as well as the evidence obtained as a
result of [the defendant's] arrest - namely, the marijuana and cash found on his person, his post-
arrest statements, and the record of his prior convictions." *Id.* The Ninth Circuit granted the
defendant's motion to suppress the evidence found during the search of the defendant outside his
house and his statements to officers. *Id.* at 1057. The Court then evaluated "whether the
remaining untainted evidence was sufficient to support issuance of the warrant." *Id.* at 1058.
That evidence consisted of "the officers' observation of [the defendant] with a handgun under
circumstances establishing probable cause to believe he had violated California Penal Code §
25850(a); and (2) the officers' knowledge of [the defendant's] criminal history, in particular his
prior conviction for carrying a loaded firearm and his two prior convictions for being a felon in
possession of a firearm." *Id.* The Ninth Circuit concluded that although that evidence was
sufficient to support a warrant to search the house for the gun they had seen the defendant
holding on the porch, it could not support probable cause to search the house generally for
"[f]irearms, assault rifles, handguns of any caliber and shotguns of any caliber, as well as
ammunition for such firearms." *Id.* at 1058-59. The court explained that "the affidavit established
that [the defendant] belonged to a class of suspects with prior firearms convictions, but didn't . . .

contain other facts tying [the defendant] himself to firearms beyond the one he had been observed carrying" *Id.* at 1059. The court cautioned that were it "to hold that this evidence suffices for probable cause, officers would have free rein to search a suspect's home anytime the suspect had prior firearms convictions and was spotted with a single gun, whether near his home or not." *Id.* at 1060. Although "the police in those circumstances might have probable cause to search for the specific firearm they observed, they would need evidence tending to show that the suspect in question . . . possessed additional firearms to justify a more expansive search." *Id.*

Here, the affidavits relied on the presence of the firearm in the Charger, evidence that Defendant may have been the driver of the Charger at the time of the accident, and Mullinix's experience that it is "common practice" for individuals who illegally possess firearms "to secrete the firearms . . . within their residence." This is insufficient to establish probable cause to search Defendant's residence for any weapon or associated items, particularly since the search of the Charger did not produce any ammunition, cartridges, or accessories that went to firearms other than the one that was found in the Charger. As in *Nora,* if the Court were to conclude under these circumstances that the search for any weapon and/or accessories was supported by probable cause, "officers would have free rein to search a suspect's home" for any weapon whenever the suspect was a possible felon in possession and was found with a single gun, "whether near his home or not." *Id.* at 1060.

The government asserted at the hearing that that even if the Court finds there was not probable cause to search for all weapons, the other firearms and accoutrements would have been inevitably discovered during the search for mobile phone x1933 because two firearms were in plain view, and the third was in an area that would have been searched when looking for x1933. "'The inevitable discovery doctrine is an exception to the exclusionary rule.'" *United States v.*

*Lanier*, No. 219CR00327GMNVCF, 2023 WL 8804073, at *14 (D. Nev. Dec. 19, 2023) (quoting *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986)). "The doctrine permits the government to rely on evidence that ultimately would have been discovered absent a constitutional violation." *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009). "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [for the exclusionary rule] has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984). "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444 n.5.

The Court finds that the government met its burden to establish that the other firearms and accoutrements at issue would have been inevitably discovered because authorities obtained the warrant to search Unit A for x1933, and the Court has concluded that portion of the warrant was supported by probable cause. The evidence reflects that two of the firearms were in plain sight in Unit A, and the third firearm was located in a closet that would have been searched for mobile phone x1933. *See, e.g., United States v. Brinkerhoff*, 404 F. App'x 147, 149 (9th Cir. 2010) ("In this case, the police would inevitably have discovered the gun because they obtained a warrant to search the vehicle for narcotics. Though the gun was not mentioned in the warrant application, the trial court correctly concluded that during the execution of the warrant, the weapon would certainly have been seized."). Accordingly, the inevitable discovery doctrine applies, and the Court denies Defendant's Motion to Suppress the evidence of the other firearms and accessories found in Unit A.

**CONCLUSION**

The Court DENIES Defendant's Motion to Suppress Evidence, ECF 23.

IT IS SO ORDERED.

DATED: _9/24/25_____.


*Marco Hernández*
_____
MARCO A. HERNÁNDEZ
United States Senior District Judge